El Pueblo de Puerto Rico, demandante y apelado, *v.* Ramón Marín, acusado y apelante.

No. 3385.—*Visto:* Mayo 22, 1928. *Resuelto:* Julio 24, 1928.

*José de J. Tizol y R. Rivera Zayas,* abogados del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El seis de abril de 1927, en el río "Manatí," cerca del puente "Mata de Platano," jurisdicción de Ciales, apareció el cadáver de un hombre que luego fué identificado como el de Tomás Peraza, de cuarenta y seis años de edad, de raza blanca, hijo legítimo, casado, natural de Hatillo, P. R., de profesión empleado.

Se creyó primero que se trataba de un ahogado. Sin embargo, como el cadáver presentara signos reveladores de actos violentos, se ordenó la práctica de su autopsia, y el facultativo que la practicaba—Doctor Eladio Izquierdo—encontró "una herida en la parte temporo occipital la que no solamente pasó el cuero cabelludo lacerándolo, sino también el cráneo, y de ahí pasó a la masa encefálica hiriendo una arteria, que es una ramificación de la cerebral posterior, y al ser cortada esta arteria hubo una hemorragia que causó la muerte". Otras contusiones, laceraciones y heridas existían. En junto,. seis. Abrió el doctor el corazón que estaba completamente dilatado, y no encontró en él sangre alguna; abrió los pulmones, y no había agua en ellos; tampoco la había en los intestinos. No encontró equimosis reveladora de la acción de algún veneno, llevándolo todo a concluir que la herida que había afectado la masa encefálica era la que había producido la muerte.

Se ha dicho que Peraza era empleado. Trabajaba a las órdenes de Manuel Marín, mayordomo de la hacienda "Monserrate" a cargo de ciertas plantaciones situadas en la jurisdicción de Ciales.

Son hechos admitidos que Marín mandó a buscar a Peraza con su otro empleado Antonio Collazo; que Peraza fué bien temprano el 5 de abril de 1927 a la casa en que Marín tenía su oficina y un cuarto con aparatos para hacer gimnasia; que Marín, que se encontraba allí, le encomendó cierto trabajo, y que a eso de las diez o las once de la mañana regresó Peraza. Los testigos Juan y Ramón Olmeda lo vieron llegar montado en una yegua, amarrar ésta en el garage y subir a la casa. No lo vieron salir. ¿Qué pasó en el interior?

Cruz Villalobos, pesebrero de Marín, que dormía en la casa-oficina, declaró en el juicio que llegó en el momento en que Marín le preguntaba a Peraza cómo estaban las cosas. Contestóle Peraza que bien y a su vez le preguntó si le habían dicho algo ''sobre unos palos de ron que se había dado el día antes.'' Replicó Marín que nada sabía, pero que estaba malo que un empleado como él bebiera. Dijo entonces Peraza que era cierto que se los había dado, pero que no lo volvería a hacer más.

Siguió declarando el testigo que en ese momento llegó Antonio Collazo y cuando Peraza lo vió lo acusó de ser él el que traía los cuentos a Marín y éste dijo que no y que qué le importaba. ''Se quedó Peraza así y dijo: yo lo que tengo, que soy un socialista lo más malo. Entonces Marín le tiró una trompada y lo trató de empuñar por el cuello y se empuñaron, y fuí a quitarlos y no quiso. Marín dijo que nos largáramos para allá, y me tiré para atrás, y se fueron pegados, y con la misma le cogió Marín el revólver a Peraza que lo tenía en el chaquetón y lo tiró sobre la mesa del comedor y se fueron pegados y cayeron a la parte del cuarto grande, y ahí al poco llamó Marín a Toño Collazo y le pidió la maceta.'' Collazo cogió la maceta, un ''indian club'' que luego se reconoció debidamente y entró con ella en la habitación. El testigo dice que no vió lo que ocurrió en la habitación, pero afirma ''que al momento salió Ramón Marín del cuarto con las manos llenas de sangre y la maceta en la mano. Se las lavó y dijo: 'no se apuren, son hombres también.' Se

quedó la cosa en calma y salió y cerró la casa y me dijo que no dejara entrar a nadie y se fué con Toño Collazo . . . Regresó como a la una, le pidió que le ensillara el caballo y salió. Volvió como a las tres . . . Estaba allí Collazo . . . y se pegó con él a emburujar el cadáver y lavar y me dijo que me quedara bajo en el rancho velando, y después me mandó con Toño a que hiciera un hoyo detrás del rancho y le hice el hoyo y a los pocos momentos bajó Toño con la lata y me la dió para que la enterrara, una lata que contenía sangre y manillas de tabaco . . . Fuí a la casa de él a dormir . . . y me acosté y a las ocho me llamó y me dijo que viniera con él . . . en auto fueron a la casa . . . Entró y me dió un bulto . . . y cogió el cadáver y se lo echó y lo tiró dentro del carro y entonces tiré el bulto también y seguimos para la carretera de Ciales . . . hasta el puente 'Mata de Plátanos' y paró el carro a la baranda del puente y tiró el bulto. Volvimos para acá y me dijo que Dios libre que lo descubriera, que si lo descubría es perdido yo y él.''

¿Qué dijo Antonio Collazo? Confirma todos los antecedentes y expresó que al llegar el día 5 a la casa en que estaba la oficina de Marín encontró a éste, a Villalobos y a Peraza y Peraza dijo: ''¿Y éste le cuenta a usted algo?'' Y contestó Marín: ''Eso tiene todo el que se emborracha, que le da con todo el que ve.'' Peraza replicó: ''Seré un socialista de los más malos'' y Marín entonces ''se le tiró encima y lo llevó pegado sobre el ceto y le sacó el revólver y lo tiró sobre la mesa y lo tiró sobre el cuarto y se le montó encima y lo cogió por la garganta y con el puño le daba . . .'' Que le pidió una maceta ''y entonces brinco y le doy la botella esa'', (reconoce el indian club), y Marín le dió dos macetazos y se la pegó a la garganta y lo tumbó y le metió la maceta aquí y estuvo un rato con la maceta aquí pegada esprimiendo, que lo veíamos nosotros de acá.''

Refiere después cómo Marín salió del cuarto y se lavó las manos y lo amenazó con matarlo si lo descubría; cómo fué lavado el cuarto y enterrada la lata y cómo envolvieron el

cadáver en una colchoneta que tomaron de la cama de Villa-
lobos. Coincide en un todo con la declaración de éste. En
lo único en que se nota discrepancia en sus declaraciones es
en que Collazo dijo que ambos vieron a Marín agredir con
la maceta a Peraza, mientras Villalobos afirma que él no vió
qué pasó en el cuarto cuando entró en él Collazo con la
maceta.

Frente a esa tremenda prueba, ¿qué opuso el acusado?
Su propia declaración en la que afirma que al llegar Collazo,
Peraza lo insultó y trató de írsele encima y como intentara
sacar el revólver, intervino y se abalanzó sobre Peraza, le
quitó el revólver y se agarró con él. Collazo quiso a su vez
intervenir pero le dijo que no se metiera y entablaron lucha
cuerpo a cuerpo y como Peraza lo derribara y sintiera que
estaba perdiendo fuerzas, gritó: "Toño, dame una maceta,
cualquier cosa, y en ese momento corrió Toño para el cuarto
. . . y sin encomendarse a nadie le dió el primer macanazo
en la cabeza . . . asegundó con otro y sintió como que el
cuerpo de ese individuo se desmongaba sobre mí . . ." Se
paró se encontró lleno de sangre "y salí para afuera, al
comedor, y le dije a Crucito: hágame el favor de darme un
poco de agua para lavarme las manos y quitarme unas
manchas de aquí. Y, estaba allí él con Toño Collazo, y yo
le dije a Crucito Villalobos, que estaba un poco atrás como
lloroso y la cara de Collazo estaba espantada, y dije: no
se apuren por nada. Ud. Crucito, ensílleme un caballo.
Entonces, en ese momento que cogía el caballo me puse a
pensar qué podía hacer en ese caso. Denunciar ese hecho
ante la justicia, a un hombre que en ese momento en realidad
me acaba de salvar la vida? Y entonces opté por callarme la
boca, creyendo que de esa manera podía ocultarlo a la jus-
ticia."

Admite lo del levado del cuarto, lo del entierro de la lata,
lo de la envoltura del cadáver en la colchoneta y el haberlo
sacado por la noche con Villalobos y tirado al río. Sus exactas
palabras en relación al incidente final, fueron: "Esperaba

allí a Antonio Collazo que había quedado en venir . . . No, señor; no llegó, y entonces me encontré con ese cadáver allí y no hallaba qué hacer, y siempre en la creencia de que podía ocultarlo a la Justicia decidí echarlo en el automóvil. . . . Llegamos a 'Mata de Plátano' y allí nos despojamos de él."

Tal fué, en resumen, la prueba practicada. Con ella como base rindió el jurado un veredicto de culpable de asesinato en segundo grado y la corte dictó sentencia imponiendo a Marín la pena de veintidós años de presidio con trabajos forzados. No conforme el condenado apeló, señalando en su alegato la comisión de tres errores

Examinemos el primero.

■ Cuando el fiscal se dirigió al jurado en los comienzos del juicio explicándole cuál era su caso y lo que intentaba probar, la defensa se opuso a que hiciera referencia alguna a los hechos imputados al acusado en relación con la ocultación del cadáver de Peraza, basándose en que dichos hechos no habían sido alegados en la acusación. Se retiró el jurado, la corte oyó la argumentación de ambas partes y declaró no haber lugar a la oposición de la defensa. La cuestión volvió a suscitarse durante la práctica de las pruebas con el mismo resultado.

Al argumentar el error, no cita el apelante jurisprudencia alguna en apoyo de su contención. Sostiene que se trata de imputar un delito distinto al acusado, que no estaba preparado para su defensa y que tales hechos tendían a predisponer al jurado en contra suya.

El fiscal hace una cita del tratado sobre "Criminal Evidence" de Underhill, que a nuestro juicio resuelve debidamente la cuestión planteada. Dice así:

"Está bien reconocido que la perpetración de un homicidio origina una perturbación mental en una persona complicada, que se manifiesta con la subsiguiente agitación que se nota en su conducta. Si se niega el cargo de que el acusado mató, o si ello se apoya en evidencia circunstancial solamente, tal evidencia es peculiarmente ade-

cuada. Si en algo era rara, es propio demostrar la conducta del acusado en la noche del crimen. Por tanto, es pertinente probar que el acusado actuaba confusamente y de una manera que no era natural en él, que sus maneras eran excitadas y nerviosas, que hablaba con rapidez y en voz baja, y que poco tiempo después del crimen o cuando se le acusaba se veía pálido y aparecía sumamente intranquilo.

"Si por su relación con el muerto era natural esperar que el acusado demostrara pena o aflicción al oír hablar de la muerte de la víctima, es propio demostrar que no lo hizo así. Cuando siendo el acusado pariente del muerto es natural que asistiera a su entierro, puede probarse que no lo hizo.

"También es pertinente la conducta del acusado después que se **entera de que se sospecha de él.** Cualquier acto que prueba o tienda a probar un esfuerzo o deseo de su parte de borrar la prueba del **crimen,** como por ejemplo lavándose las manos o la ropa para quitarse las manchas de sangre, u ocultando o destruyendo las armas, escondiendo objetos que se ha demostrado que pertenecían al muerto, o su fuga o intentos de fugarse, o su nerviosidad o silencio al acusársele del crimen por primera vez, es siempre pertinente, pues de estos hechos, si no son explicados, el jurado puede darse justa cuenta de su condición mental y puede inferir que demuestran su culpabilidad."

Como razona luego el fiscal en su alegato, no hay duda alguna de que en una acusación no es necesario alegar hechos anteriores y posteriores a la comisión del crimen, y el hecho de que en el presente caso no se haya alegado la ocultación del crimen por parte del acusado, no implica que El Pueblo no pudiera presentar esa prueba, que es siempre pertinente como parte del *res-gestae,* para demostrar la condición de ánimo del acusado, la serenidad y sangre fría en la perpetración del hecho, cuando, después de cometido, realiza como realizó en este caso los actos que conocemos que no indican otra cosa que un corazón pervertido y maligno, como dice el código tratando del asesinato.

Los errores segundo y tercero pueden estudiarse y resolverse conjuntamente.

Al terminar su prueba el fiscal, la defensa solicitó la abso-

lución perentoria del acusado porque la única prueba directa que existía consistía en la declaración de un cómplice. La corte no accedió explicando que daría las debidas instrucciones al jurado. Y se sostiene que la corte erró.

El apelante sostiene además que el veredicto es erróneo porque el jurado fué influenciado indebidamente por la prueba sobre la ocultación del cadáver y por la decisión de la corte sometiéndole la cuestión de si el testigo Antonio Collado era cómplice o no, y si lo era, si existía suficiente corroboración.

Las instrucciones de la corte sobre esos extremos son amplísimas y correctas. El caso por entero quedó sometido al Jurado. Era para los jueces de hecho decidir a quién creían, si a Collado o a Marín, y ellos resolvieron el conflicto en contra de Marín. Una vez decidido el conflicto, no cabe sostener que Collado fuera un cómplice o un coautor. Pero aunque lo fuera, existe en la declaración de Villalobos una corroboración tan clara y tan fuerte que su testimonio hubiera sido siempre admisible.

Se trata de un caso claro, de un crimen perpetrado con ensañamiento y crueldad extraordinarios, bien y prontamente investigado y sometido por el fiscal a la corte y al jurado. La corte dirigió serenamente el juicio. La defensa tuvo todas las amplias oportunidades que nuestras leyes le garantizan y en verdad el veredicto del jurado no pudo ser otro que el rendido.

*Debe confirmarse la sentencia recurrida.*